**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Regina M. Rodriguez**

Civil Action No. 24-cr-00126-RMR-2

UNITED STATES OF AMERICA,

     Plaintiff,

v.

RAUDEL MAYORGA-IBARRA,

     Defendant.

---

**ORDER**

---

This matter is before the Court on Defendant Raudel Mayorga-Ibarra's Motion to Suppress Out-of-Court and In-Court Identifications and Motion to Suppress All Fruits of Mr. Mayorga-Ibarra's Unlawful Detention. ECF Nos. 25 and 26.[1]. Defendant argues Aurora Police Officers detained him without reasonable suspicion and interrogated without advising him of his rights. Therefore, the stop—from its inception—was illegal and all fruits of the illegal stop should be suppressed. In particular, Defendant maintains that the footage from the Officers' body-worn cameras ("BWC") during the stop should not have been used by another Officer in a separate drug investigation to identify Defendant. Defendant's current charges resulted from that drug investigation. Accordingly, Defendant asks the Court to exclude both the out-of-court and in-court identifications of

---

[1] The Government filed respective responses (ECF Nos. 39 and 40), and Defendant filed respective replies (ECF Nos. 44 and 45).

him in the drug distribution prosecution currently pending before the Court. The Court held an evidentiary hearing on March 4, 2026 and March 10, 2026. ECF Nos. 55 and 56.

For the reasons stated below, the Motion to Suppress Out-of-Court and In-Court Identifications, ECF No. 25, is **DENIED**, and the Motion to Suppress All Fruits of Mr. Mayorga-Ibarra's Unlawful Detention, ECF No. 26, is **GRANTED IN PART AND DENIED IN PART**.

## I.  BACKGROUND[2]

On April 24, 2024, Defendant Raudel Mayorga-Ibarra was indicted on multiple drug possession and distribution counts which is the case pending before this Court.[3]

The key issue in this case surrounds the legality of Task Force Officer ("TFO") Tony Collett's identification of Mr. Mayorga-Ibarra as a drug runner in an undercover drug trafficking investigation. TFO Collett purchased drugs from the drug runner two times before his identification. In each instance, the drug runner was in a gray Subaru with temporary tags. TFO Collett ran the temporary tag information and discovered the gray Subaru had been queried two other times by Aurora Police Officers Christopher Mowry and Max Schoolmaster. TFO Collett contacted each of the Officers to see if they had more information about the vehicle and the driver.

---

[2] The Court relies on the background facts provided in the parties' briefing and testimony from the evidentiary hearing. *See* ECF No. 25 at 1-4, ECF No. 26 at 2-4, ECF No. 39 at 2-3, ECF No. 40 at 2-6, ECF No. 60 (March 3, 2026 Evidentiary Hr'g Tr.); ECF No. 61 (March 10, 2026 Evidentiary Hr'g Tr.).

[3] Mr. Mayorga-Ibarra was indicted on: (1) one count of conspiracy to possess with intent to distribute methamphetamine, heroin, and fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and 846; (2) two counts of possession with intent to distribute methamphetamine and aiding and abetting the distribution of methamphetamine, in violation of 18 U.S.C. §§ 841(a)(1) and 2; (3) one count of possession with intent to distribute heroin and aiding and abetting the distribution of heroin, in violation of 18 U.S.C. §§ 841(a)(1) and 2; and (4) two counts of possession with intent to distribute fentanyl and aiding and abetting the distribution of fentanyl, in violation of 18 U.S.C. §§ 841(a)(1) and 2. ECF No. 1.

As it turns out, Officers Mowry and Schoolmaster interacted with Mr. Mayorga-Ibarra on January 17, 2023 when they detained him. Officer Schoolmaster sent TFO Collett text messages and photos from his BWC footage of Mr. Mayorga-Ibarra. He also provided his BWC footage from the January 17, 2023 encounter, which TFO Collett used to identify Mr. Mayorga-Ibarra as the drug runner from his investigation. Mr. Mayorga-Ibarra challenges both (1) the legality of the January 17, 2023 encounter with Officers Mowry and Schoolmaster and (2) the lawfulness of TFO Collett's identification procedure.

### A.  Aurora Police Officer Encounter

On January 17, 2023, shortly after 5:00 p.m., Officers Schoolmaster and Mowry were patrolling the area of the 900 block of North Emporia Street in an unmarked police car. ECF No. 60 at 7:20-23. The Officers were in that area because they were aware of several stolen vehicles parked in the alley in the weeks prior. *Id.* at 7:24-8:3. Officer Schoolmaster testified that he "had observed several stolen vehicles" at 923 Emporia Street. *Id.* at 9:12-23. According to Officer Schoolmaster, the "male resident there was always working on vehicles," and there were "parts in the yard" adjacent to the driveway. *Id.* Officer Schoolmaster further testified that, "[w]ith the frequency of stolen vehicles there," the officers believed that the male resident "had been offering his services to repair them" or "disguise them, if a suspect brought a stolen vehicle there." *Id.* Additionally, Officer Mowry had recently contacted a gang member in that area. *Id.* at 112:13-20.

On this particular day, the officers saw a Hyundai parked in the alley that seemed to be running. *Id.* at 11:12-18, 60:10-13. When the officers ran the license plate, they discovered the Hyundai was reported stolen on December 9, 2022. *Id.* at 11:12-18, 120:5-19. The officers attempted to "casually drive past" the stolen vehicle and noticed at least

one person in the car while other people were outside the car—seemingly conversing with the occupant. *Id.* at 12:21-13:8. Once the Officers drove past the stolen Hyundai, it took off out of the alley. *Id.* at 12:21-13:1. The Officers could not catch up with the Hyundai and, around 5:23 p.m., decided to go back to the alley to try to get information from the people talking to the driver. *Id.* at 13:23-14:12, 124:3-8. The Officers were also interested to see if the other car in the driveway was stolen, because they knew the pickup truck in the driveway was associated with other stolen vehicles.[4] *Id.* at 125:25-127:1.

When the officers returned to the alley at 923 Emporia Street, they saw "Leo" standing outside and a female, "Crystal," by the door of the residence. *Id.* at 15:4-18. The Officers knew both of these individuals. *Id.* at 24:3-11. After getting out of the police vehicle, Officer Schoolmaster noticed Mr. Mayorga-Ibarra standing next to a gray Subaru parked in the rear driveway. *Id.* at 15:15-16:11. Officer Schoolmaster did not recognize the Subaru or Mr. Mayorga-Ibarra, and the pickup truck parked behind it was blocking the license plate. *Id.* at 16:22-17:4. Because this was a known area for stolen vehicles, Officer Schoolmaster believed the Subaru could have been stolen, and someone was trying to hide the license plate. *Id.* at 17:7-25. Additionally, the Subaru had a temporary license plate, which is a "frequent tactic" on a stolen vehicle to "try and hide from detection or throw off an investigation." *Id.* at 17:1-17.

At around 5:24 p.m., Officer Mowry began speaking with Mr. Mayorga-Ibarra. *Id.* at 128:20-129:25. Officer Mowry believed Mr. Mayorga-Ibarra was "not simply an innocent bystander at the residence," because "he'd probably been interacting with the driver of

---

[4] The Officers also refer to the "pickup truck" as a "tow truck." *See* ECF No. 60 at 31:12-16 ("Q: Okay. And earlier in that clip we also heard you ask Leo if he had gotten something to run. Did you recall that part? A: It's the tow truck, pickup truck, that's parked perpendicular to my left in the video.").

the stolen car." *Id.* at 130:22-131:9. Officer Mowry called for Leo who was standing near the door of the residence at around 5:25 p.m. *Id.* at 131:10-21. The officer knew Leo had a lengthy criminal history and was a resident of the house. *Id.* at 132:6-14. At this point, Leo confirmed that he knew the driver of the stolen car. *Id.* at 133:17-134:2. Concerned that the Subaru was also stolen, Officer Mowry began investigating and asked Mr. Mayorga-Ibarra for his name. *Id.* at 133:17-135:4. He did not ask for Leo's or Crystal's names because he already knew them. *Id.*

At about 5:26 p.m., Officer Mowry asked Mr. Mayorga-Ibarra to move so he was facing the same direction as Leo. *Id.* at 24:20-50:12. Mr. Mayorga-Ibarra complied. *Id.* at 171:7-20. At this point, it was clear that Mr. Mayorga-Ibarra did not speak English. *Id.* at 167:6-25. Officer Schoolmaster, who speaks some Spanish, asked Mr. Mayorga-Ibarra if he had any weapons, while Officer Mowry patted him down. *Id.* at 25:17-22. The pat-down did not uncover any weapons. *Id.* at 136:17-138:1. Neither officer frisked any other individuals. *Id.* at 170:15-171:6. Then, Officer Mowry asked if Leo or Mr. Mayorga-Ibarra knew anything about "Gordo," someone the officers believed could have been driving the stolen car and a known member of Crenshaw Mafia Gangsters. *Id.* at 27:5-12, 38:14-39:10. Leo said that he met Gordo through "Yogi," a known prolific car thief. *Id.* at 139:2-140:21. Officer Mowry also told Mr. Mayorga-Ibarra to wait to light his cigarette, as a safety measure for the officers. *Id.* at 26:15-25.

Officer Schoolmaster asked Mr. Mayorga-Ibarra if the Subaru was his car, and he nodded his head. *Id.* at 28:5-22. Then, Officer Schoolmaster asked Mr. Mayorga-Ibarra for his identification, which Mr. Mayorga-Ibarra retrieved from the vehicle and handed to Officer Mowry at 5:27 p.m. *Id.* at 29:2-30:11, 138:3-23. Officer Mowry ran Mr. Mayorga-

5

Ibarra's information on the computer to confirm his identity and held onto his identification card from this moment until the end of the stop. *Id.* at 37:20-23, 177:1-14. When Officer Mowry ran the identification information, Officer Schoolmaster asked Leo where Mr. Mayorga-Ibarra was from and where he was staying. *Id.* at 37:2-8. Leo said that he was staying with him while on vacation. *Id.*

Around the time when Mr. Mayorga-Ibarra gave Officer Mowry his identification, Crystal asked if she could go back to the residence, and the officers said yes. *Id.* at 30:14-22. During the interaction, Officer Schoolmaster translated for Officer Mowry, who asked Mr. Mayorga-Ibarra about the tattoos on his body. *Id.* at 32:25-34:1. Officer Mowry also ran the tags on the gray Subaru and determined it was not stolen around 5:34 p.m. *id.* at 143:7-144:1. Additionally, Mr. Mayorga-Ibarra indicated he had the title to the vehicle in the car. *Id.* at 39:17-22.

Around the same time, another individual "Carla Meza" or "Gio" appeared on the scene. *Id.* at 40:7-16. The officers had numerous criminal contacts with Gio in the past. *Id.* Officer Mowry began asking Gio about Gordo to try to determine where Gordo was. *Id.* at 40:24-41:4. Officer Mowry also asked Mr. Mayorga-Ibarra if he could search the Subaru, while also telling Mr. Mayorga-Ibarra he did not have to give him permission. *Id.* at 40:24-42:7. At this point, the Officers already knew the Subaru was not stolen. *Id.* at 175:11-19. Without speaking, Mr. Mayorga-Ibarra stepped aside and "made an arm gesture to kind of welcome" Officer Mowry towards the Subaru. *Id.* at 41:25-42:16. Officer Schoolmaster interpreted the gesture as a "yes, that's okay" to Officer Mowry's request to search the Subaru. *Id.* at 42:17-19. Officer Mowry found a scale in the car and asked what it was for. *Id.* at 43:9-21. Gio translated for Mr. Mayorga-Ibarra, who responded it

might have come with the car. *Id.* Otherwise, Officer Mowry did not find anything of interest to him in the Subaru. *Id.* at 45:13-15. However, at around 5:39 p.m., Officer Mowry found a small bindle of heroin in the driveway and subsequently detained Mr. Mayorga-Ibarra in handcuffs. *Id.* at 45:16-46:1. Ultimately, Mr. Mayorga-Ibarra was released at the scene and was not charged with any offenses on January 17, 2023. *Id.* at 46:2-7.

## B. TFO Collett's Undercover Drug Investigation

TFO Collett is a narcotics investigator tasked with "investigating international drug trafficking and money laundering cases." ECF No. 61 (March 10, 2026 Tr.) at 4:13-19. In January 2023, TFO Collett was engaged in an undercover drug trafficking investigation of a primary target called "Carlos." *Id.* at 14:5-14. He communicated with Carlos primarily via text to coordinate drug transactions. *Id.* at 15:2-12. One of these arranged drug transactions occurred on January 13, 2023 when Carlos indicated he wanted to provide TFO Collett with a sample of drugs for free. *Id.* at 15:9-17. TFO Collett had previously met with a different drug runner, but Carlos told TFO Collett that the person meeting him for the January 13, 2023 transaction would be a new person in a gray Subaru. *Id.* at 16:5-16.

TFO Collett met this new drug runner mid-day, in the daylight, on January 13, 2023. *Id.* at 17:8-10. The officer got into the front passenger seat of the gray Subaru, which had a temporary license plate. *Id.* at 17:11-18:11. The driver was the only other person in the vehicle, and the distance between them was about a foot and a half. *Id.* at 18:12-24. The entire encounter lasted approximately twenty seconds, ECF No. 25, Exhibit A, and TFO Collett filed a report of the January 13, 2023 investigation encounter that included a description of the driver, ECF No. 25, Exhibit B. In the investigation report, TFO Collett

described the driver as a "Hispanic male who was clean shaven with a mostly bald head" and wearing a ball cap. ECF No. 61 at 18:25-19:6. TFO Collett testified he noticed a prominent tattoo on the driver's right forearm and another tattoo on the right side of his neck, *id.* at 19:7-16, but he did not include the tattoos in his description in the investigation report, *id*. at 44:10-17.

After the January 13, 2023 encounter, TFO Collett continued to speak with Carlos. ECF No. 61 at 23:11-18. On January 25, 2023, TFO Collett arranged another transaction to purchase one thousand fentanyl pills from Carlos. *Id.* at 23:25-24:6. This time, TFO Collett met with the drug runner around 2:00 p.m. *Id.* at 24:11-23. The same gray Subaru from the January 13, 2023 transaction showed up at this encounter. *Id.* at 25:2-26:11. TFO Collett got into the front passenger seat again and observed the same individual, with the same "close-cropped, shaved" hairstyle, from the previous transaction. *Id.* at 26:6-27:6. During the approximately ninety-second interaction, the driver handed TFO Collett a breadcrumb container with the fentanyl pills. *Id.* at 27:22-28:8; ECF No. 25, Exhibit D. TFO Collett confirmed that the container had the fentanyl pills, thanked the driver, knuckle-bumped him, and got out of the car. ECF No. 61 at 28:15-18. TFO Collett testified that he was confident the individual from the January 25, 2023 encounter was the same individual he transacted with on January 13, 2023. *Id.* at 28:19-22. During his law enforcement career, TFO Collett has conducted other undercover investigations and been called to identify individuals. *Id.* at 7:10-8:2.

After the January 25, 2023 encounter, TFO Collett searched the temporary tag on the gray Subaru and discovered that it had previously been queried by Aurora Police Officers Max Schoolmaster and Chris Mowry. *Id.* at 30:14-31:7. TFO Collett contacted the

two police officers "to ask them if they remembered querying the vehicle and the circumstances surrounding it." *Id.* at 31:13-21. He left voicemails for both officers but did not provide any details about the drug trafficking investigation in his message. *Id.* at 32:5-33:11. Officer Schoolmaster responded and had a phone call with TFO Collett discussing the circumstances of Officer Schoolmaster's contact with the vehicle. *Id.* at 33:23-34:5. On February 7, 2023, TFO Collett and Officer Schoolmaster also exchanged several text messages about the contact. *Id.* at 37:20-39:25; Hr'g Ex. 3; Hr'g Ex. 4. The first text message sent included a photo from Officer Schoolmaster's BWC footage of Mr. Mayorga-Ibarra. ECF No. 61 at 37:20-38:17; Hr'g Ex. 3 at APD_00000027. The time stamp of the photo was 6:00 p.m. on January 17, 2023. Hr'g Ex. F at INV_0000081. Officer Schoolmaster also sent TFO Collett Mr. Mayorga-Ibarra's name, date of birth, and the fact he had a Mexico identification card, which informed TFO Collett that Mr. Mayorga-Ibarra was associated with the gray Subaru involved in the two drug encounters. ECF No. 61 at 40:6-23, 42:15-22; Hr'g Ex. 4 at INV_00000137.

At this point, TFO Collett testified he was "confident that's the guy that [he] had dealt with, but [he] want[ed] to be extra confident." *Id.* at 44:1-9. For that reason, TFO Collett asked Officer Schoolmaster about the gray Subaru owner's tattoos. *Id.*; Hr'g Ex. 4 at INV_00000137. In response, Officer Schoolmaster sent TFO Collett photos from his BWC footage of Mr. Mayorga-Ibarra. ECF No. 61 at 45:1-46:3; Hr'g Ex. 3 at APD_00000028-29; Hr'g Ex. at INV_00000138. In one of the photos, TFO Collett recognized Mr. Mayorga-Ibarra leaning against the gray Subaru. ECF No. 61 at 48:1-13; Hr'g Ex. 3 at ADP_00000029.

To confirm the identification further, TFO Collett asked for Officer Schoolmaster's BWC footage from the encounter. *Id.* at 49:13-17. TFO Collett wanted to "hear his voice" and "see him in motion' to be "extra sure" about his identification of Mr. Mayorga-Ibarra. *Id.* at 49:2-12. Officer Schoolmaster sent TFO Collett the link to the BWC footage at 3:15 p.m. on February 7. *Id.* at 107:9-12. At 3:27 p.m., TFO Collett sent a text to Officer Schoolmaster saying "Mayorga is the dude I've been meeting." *Id.* at 54:20-55:12; Hr'g Ex. 4 at INV_00000140. TFO Collett testified he watched the BWC footage and was able to identify Mr. Mayorga-Ibarra "when he came in –- on the screen." *Id.* at 50:5-11. TFO Collett watched the footage alone and did not have any conversations with other law enforcement agents about the footage while watching it. *Id.* at 54:7-19. The email sharing the BWC footage did not contain any information about the drug trafficking investigation. *Id.* at 49:16-50:1.

On February 9, 2023, TFO Collett coordinated another drug transaction for two pounds of methamphetamine. ECF No. 61 at 62:15-24, 63:19-25. This transaction occurred during the day and involved the same gray Subaru. *Id.* at 63:3-12. TFO Collett recognized the driver as Mr. Mayorga-Ibarra. *Id.* at 63:15-18.

## II.  LEGAL STANDARD

### A.  *Terry* Stop

"The Fourth Amendment guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States*, 517 U.S. 806, 809-10 (1996)

10

(quoting U.S. Const. amend. IV). In *Terry v. Ohio*, the Supreme Court established that a law enforcement officer "may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to arrest." *United States v. Treto-Haro*, 287 F.3d 1000, 1004 (10th Cir.2002) (quoting *Terry v. Ohio*, 392 U.S. 1, 22 (1968)) (internal quotation marks omitted). "To be 'reasonable' a police officer's investigatory stop must be 'justified at its inception,' and the 'officer's actions must be reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Daniels*, 101 F.4th 770, 776 (10th Cir. 2024) (citing *United States v. Madrid*, 713 F.3d 1251, 1256 (10th Cir. 2013)).

"An investigatory detention is justified at its inception if the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime, or that criminal activity may be afoot." *Id.* (citations omitted). In other words, officers must have "reasonable suspicion that criminal activity is, has, or is about to occur." *Id.* (citation omitted). "The objective nature of this standard is key." *Id.* "In determining whether reasonable suspicion exists, the totality of the circumstances—the whole picture—must be taken into account." *United States v. Cheromiah*, 455 F.3d 1216, 1221 (10th Cir. 2006). Additionally, "conduct that may be wholly innocent may nonetheless support a finding of reasonable suspicion in circumstances." *Daniels*, 101 F.4th at 776. However, reasonable suspicion must be more than an "inchoate and unparticularized suspicion or hunch." *Donahue v. Wihongi*, 948 F.3d 1177, 1188 (10th Cir. 2020). "The government bears the burden of proving the reasonableness of the officer's suspicion." *Vance*, 893 F.3d at 773.

11

### B. Custodial Detention

"Prior to custodial questioning, a suspect must be warned that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *United States v. Guillen*, 995 F.3d 1095, 1108-9 (10th Cir. 2021) (citations omitted). "Without these warnings, custodial confessions are presumed to be the product of coercion and are generally inadmissible for purposes of the prosecution's case in chief." *Id.* at 1109. However, *Miranda* warnings are only required when an "individual is in 'custody' and subjected to 'interrogation.'" *Id.*

An individual is in "custody" when "a reasonable person in the suspect's position would understand his or her situation as the functional equivalent of formal arrest." *Id.* Factors that inform whether an individual is in "custody" include: "(1) whether the circumstances demonstrated a police-dominated atmosphere; (2) whether the nature and length of the officers' questioning was accusatory or coercive; and (3) whether the police made [the defendant] aware that [he or she] was free to refrain from answering questions, or to otherwise end the interview." *Id.*

### C. Out-of-Court and In-Court Identifications

"The Supreme Court has recognized a due process check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." *United States v. Ruiz*, 116 F.4th 1246, 1251 (10th Cir. 2024) (citing *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012)). The suggestiveness must create a very

substantial likelihood of irreparable misidentification to warrant exclusion of a witness's identification testimony. *Id.* (citing *United States v. Thody*, 978 F.2d 625, 629 (10th Cir. 1992)). In *Manson v. Brathwaite*, the Supreme Court established "the admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability." 432 U.S. 98, 106 (1977).

In examining the constitutionality of a pretrial identification procedure, courts first "determine whether the procedure was unnecessarily suggestive." *United States v. Caldwell*, 1996 WL 185749, *3 (10th Cir. 1996) (unpublished). If the procedure is deemed unnecessarily suggestive, courts then "decide whether the identification was reliable under the totality of the circumstances." *Id.* "[R]eliability is the linchpin in determining the admissibility of identification testimony." *Brathwaite*, 432 U.S. at 114. The factors to be considered in determining reliability include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the confrontation." *Id.* (citing *Neil v. Biggers*, 409 U.S. 188 (1972)). The "defendant has the initial burden of proving that the identification procedure was impermissibly suggestive." *English v. Cody*, 241 F.3d 1279, 1282 (10th Cir. 2001). Then, "the burden shifts to the government to prove that the identification was reliable independent of the suggestive procedure." *Id.* at 1282-83.

Additionally, when "witnesses [make] in-court identifications arguably stemming from previous exposure to a suggestive photographic array," "each case must be considered on its own facts" and "convictions based on eye-witness identification at trial

13

following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Biggers*, 409 U.S. at 197.

### III. ANALYSIS

Mr. Mayorga-Ibarra asserts that his Fourth Amendment rights were violated on January 17, 2023 from the beginning of the encounter with Officers Schoolmaster and Mowry and, therefore, all evidence obtained during that encounter should be suppressed. ECF No. 26 at 1. Additionally, Mr. Mayorga-Ibarra alleges TFO Collett's out-of-court identification was the result of an unduly suggestive identification procedure and should be suppressed. ECF No. 25 at 1. He also contends any in-court identification of Mr. Mayorga-Ibarra should also be precluded. *Id.*

### A. The January 17, 2023 Encounter with Aurora Police Officers

With respect to the January 17, 2023 encounter, Mr. Mayorga-Ibarra argues "the Aurora police officers committed multiple constitutional violations, all requiring the suppression of evidence in this case." ECF No. 26 at 5. Specifically, Mr. Mayorga-Ibarra alleges the officers unlawfully detained him in the absence of probable cause or reasonable suspicion to believe that he committed a crime and the officers asked him questions throughout the interaction without ever advising him of his *Miranda* rights. *Id.* The Court addresses each argument below.

#### 1. Initial Stop

An investigatory stop is lawful when it is "justified at its inception" and when the officers' actions are "reasonably related in scope to the circumstances which justified the interference in the first place." *Daniels*, 101 F.4th at 776. For an investigatory detention

14

to be justified at its inception, the "specific and articulable facts and rational inferences drawn from those facts" must give rise to a "reasonable suspicion a person has or is committing a crime, or that criminal activity may be afoot." *Id.*

Here, Mr. Mayorga-Ibarra claims the officers did not have reasonable suspicion to justify the January 17, 2023 stop at its inception. ECF No. 26 at 7; ECF No. 45 at 2. According to Mr. Mayorga-Ibarra, "[h]e was merely standing the in the back driveway area of a home, with two other individuals, when the police approached." ECF No. 26 at 8. He was not linked to the stolen vehicle. *Id.* at 7. He was not observed committing any crime, and he was not a target of the officers' investigation. *Id.* In Defendant's telling of the events, there was "[n]othing specific or articulable about any suspicion the officers may have had. At best, the police were operating on hunches." *Id* at 8. Therefore, Defendant asserts the officers did not have reasonable suspicion to justify the stop at its inception, and the entire interaction was an illegal detention in violation of his Constitutional rights.

The Government contends the "officers knew specific and articulable facts to warrant a *Terry* stop of the defendant." ECF No. 40 at 8. The Government relies on the fact that the officers "knew the individuals at the Emporia Street Duplex were heavily involved with criminal activity," "the duplex had been associated with multiple stolen vehicles," and the "officers observed a stolen vehicle stopped in the alleyway immediately outside the Emporia Street Duplex." *Id.* Additionally, the officers "observed the defendant working on a vehicle with temporary plates, two weeks after observing a different vehicle with *fake* temporary plates at the Emporia Street Duplex." *Id.* at 9. Considered together, the Government argues the officers had reasonable suspicion to initiate the investigatory stop. *Id.*

15

Reasonable suspicion must be more than an "inchoate and unparticularized suspicion or hunch." *Donahue*, 948 F.3d at 1188. However, innocent conduct may support a finding of reasonable suspicion. *Daniels*, 101 F.4th at 776. In this case, the Officers had an objective basis for suspecting Mr. Mayorga-Ibarra may be involved in criminal activity. First, the Officers witnessed a crime. They saw a stolen car in the alley behind 923 Emporia Street. The car appeared to be running and the occupant was talking with people outside the car. When they drove by the stolen Hyundai, the car drove off. The Officers attempted to follow it but lost track of it. They decided to return to the alley to try to get information about the driver of the stolen car. When they returned to the alley, the Officers saw Mr. Mayorga-Ibarra next to a Subaru with a temporary license plate parked in the driveway. Given the Officers' experience investigating crimes and, in particular, crimes at this location, they believed the Subaru in the driveway might have been stolen. Additionally, they suspected the people at the location might have information regarding the stolen Hyundai. From the Officers' experience, temporary tags were often used on stolen vehicles. Given Mr. Mayorga-Ibarra was at the location where they had just observed the stolen car, the Officers had reasonable suspicion he could be involved with that stolen car.[5]

Second, Both Officers Schoolmaster and Mowry testified that the area around 923 Emporia Street was known to be associated with multiple stolen vehicles. "[T]he fact that a stop occurred in a high-crime area cannot alone justify a *Terry* stop." *United States v. Daniels*, No. 21-CR-00332-RMR, 2022 WL 18638775, at *6 (D. Colo. Sept. 29, 2022),

---

[5] At the evidentiary hearing, the Court found the Officers' testimony regarding their experience at this location in the past, the suspicion they had regarding Mr. Mayorga-Ibarra's knowledge about the stolen Hyundai, his relation to the Subaru with temporary tags and the possibility this meant that vehicle was also stolen was credible.

*aff'd*, 101 F.4th 770 (10th Cir. 2024). However, "courts have repeatedly held that such a characteristic of the location of the stop is relevant to the analysis and may be taken into consideration." *Id.* Additionally, the Officers testified they saw a pickup truck parked behind the Subaru which was blocking the license plate. From their experience, the Officers recognized this parking position as a way to hide fake license plates. Also, they recognized the pickup truck, which had a tow-hook on it, as being involved with other stolen vehicles. This coupled with the fact that a stolen vehicle had just left the scene caused the Officers to believe that Mr. Mayorga-Ibarra may be involved or have information about the criminal activity they witnessed.

When determining whether reasonable suspicion exists, the Court must consider the totality of the circumstances. *Cheromiah*, 455 F.3d at 1221. Officer Mowry believed Mr. Mayorga-Ibarra was not an "innocent bystander," because he probably interacted with the driver of the stolen car. Further, Officer Schoolmaster explained that he was suspicious of the Subaru, because the pickup truck was parked in a way that hid the temporary license plate of the Subaru. This testimony taken into consideration with the fact that the Officers just observed a stolen vehicle and the area was known for criminal activity demonstrates the Officer's initial detention of Defendant was supported by reasonable suspicion.

Defendant suggests the Court should come to the same conclusion it did in *Daniels*, which the Tenth Circuit affirmed. In that case, the officers were dispatched to a densely populated, well-lit parking lot in response to an anonymous call concerning suspicious behavior by individuals getting in and out of a dark SUV. *Daniels*, 101 F.4th at 775. When the officers arrived on the scene, they "did not witness *any activity whatsoever*"

17

around the SUV. *Id.* at 779-80. Additionally, the SUV drove away at a normal rate of speed as the officer approached. *Id.* at 781. The facts in this case are different. Here, the officers had just observed criminal activity—the stolen Hyundai sped away from the alley behind 923 Emporia Street. Mr. Mayorga-Ibarra was standing in the driveway near the same location, next to a vehicle with temporary plates. The Officers were aware that stolen vehicles typically have temporary plates and that stolen vehicles were frequently found in the area. Although the officers eventually determined the Subaru was not stolen, innocent conduct may support a finding of reasonable suspicion. Considering all these facts together, the Court finds the officers had reasonable suspicion that Mr. Mayorga-Ibarra may have been involved with criminal activity to justify the stop at its inception.

Next, the officers' actions in a lawful investigatory stop "must be reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 776. The Government argues it was "reasonable for officers to try to determine the ownership of the Subaru sedan, whether it had been reported stolen, and whether the temporary plates attached to the Subaru were legitimate." ECF No. 40 at 9. Therefore, the questions the officers asked related to the stolen vehicle, known car thieves (Gordo and Yogi), and Mr. Mayorga-Ibarra's identity were reasonable. *Id.* at 9-10.

Indeed, "[a]sking questions is an essential part of police investigations." *Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty.*, 542 U.S. 177, 185 (2004). The Supreme Court has "recognized that a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further." *Id.* "[Q]uestions concerning a suspect's identity are a routine and accepted part of many *Terry* stops." *Id.* at 186. Here, the Officers

18

asked questions reasonably related to their investigation of the stolen Hyundai and whether the Subaru was also a stolen car. These initial questions were limited to the identity of the driver of the stolen car, "Gordo" and "Yogi," and Mr. Mayorga-Ibarra. These types of questions are classic, reasonable investigatory questions.

Additionally, the Officers only confirmed the gray Subaru was not stolen when they ran the temporary tag. The Tenth Circuit has "held that reasonable suspicion premised on a suspected license-plate violation dissipated after the officer approached the vehicle on foot and reasonably could have observed the registration number on the [] license plate." *United States v. Campbell*, 156 F.4th 1019, 1025 (10th Cir. 2025). The license plate violation in *Campbell* is distinguishable from potentially fraudulent temporary tags. Here, the officers could not confirm the validity of the temporary tag until it was queried, which supports the reasonableness of the investigatory stop. Around 5:34 p.m., Officer Mowry searched the Subaru and knew it was not reported stolen. At this point, the reasonable suspicion justifying the Officers' investigative detention was dispelled. However, the Officers continued to ask Mr. Mayorga-Ibarra questions, such as whether he had the title to the car. It could be argued the investigative stop arguably turned into an unlawful detention at this point, which the Court addresses in the following section.

Finally, the officers also frisked Mr. Mayorga-Ibarra at the beginning of the investigative stop. "During the course of a valid investigative detention, an officer may conduct a limited protective search ('frisk') if the officer harbors an articulable and reasonable suspicion that the person is armed and dangerous." *United States v. Hammond*, 890 F.3d 901, 904 (10th Cir. 2018). The Government has represented it will not introduce the fruits of the frisk. *See* ECF No. 40 at 6 n.5. Thus, the Court need not

address the lawfulness of the frisk itself. *See United States v. Elmore*, 101 F.4th 1210, 1220 (10th Cir. 2024) (explaining the exclusionary rule requires courts to exclude "evidence discovered later but derived from [a] Fourth Amendment violation.").

Because the testimony and evidence demonstrates the Officers had reasonable suspicion to justify the stop at its inception and the Officers' actions were reasonably related in scope to the circumstances, the Court concludes the Government has satisfied its burden of demonstrating the initial stop was lawful.

### 2. Custodial Detention

Mr. Mayorga-Ibarra contends that, even if the *Terry* stop was lawful, the remainder of the encounter was unlawful and evidence obtained from that portion of the encounter should be suppressed. ECF No. 45 at 4. However, Defendant does not identify when such custody occurred—other than when Mr. Mayorga-Ibarra was placed in handcuffs. Rather, Mr. Mayorga-Ibarra argues he was in custody from the beginning of the encounter and not given *Miranda* warnings prior to interrogation. ECF No. 26 at 12-15. The Government asserts that "a reasonable person in the defendant's shoes would not have believed his scenario was the functional equivalent of a formal arrest" and, therefore, Mr. Mayorga-Ibarra was not subjected to custodial interrogation. ECF No. 40 at 11.[6]

The law is clear that an individual is in "custody" for the purposes of *Miranda* when a reasonable person in his position would understand his situation as the functional equivalent of formal arrest. *Guillen*, 995 F.3d at 1108-9. The parties do not dispute that Mr. Mayorga-Ibarra was in custody when he was placed in handcuffs at 5:39 p.m. on

---

[6] The Government is not seeking to admit any statements after 17:39:10 on January 17, 2023, after Mr. Mayorga-Ibarra was placed in handcuffs. ECF No. 40 at 11. Therefore, the Court only addresses the events prior to 17:39:10 on January 17, 2023.

January 17, 2023. Additionally, there is no question that the Officers did not Mirandize Mr. Mayorga-Ibarra when they handcuffed him and questioned him. The Government has agreed it "will not introduce any evidence in its case-in-chief at trial from the January 17, 2023 encounter that occurred after 17:39:10." ECF No. 40 at 6 n.5. Based on the Government's agreement, evidence obtained beyond 17:39:10 shall not be used at trial.

Accordingly, Defendant's Motion to Suppress All Fruits of Mr. Mayorga-Ibarra's Unlawful Detention (ECF No. 26) is GRANTED IN PART with respect to evidence obtained after 5:39 p.m. on January 17, 2023 and DENIED IN PART with respect to evidence obtained before 5:39 p.m. on January 17, 2023.

### B. TFO Collett's Identification of Mr. Mayorga-Ibarra

Having analyzed the lawfulness of the January 17, 2023 encounter, the key issue in this case still remains—the lawfulness of TFO Collett's identification of Mr. Mayorga-Ibarra as the driver in his undercover drug trafficking investigation. Specifically, the parties dispute TFO Collett's reliance on Officer Schoolmaster's BWC footage and photos when identifying Mr. Mayorga-Ibarra. Defendant argues that "TFO Collett self-administered an impermissibly suggestive identification procedure and, in so doing, irreparably tainted the identification evidence in this case." ECF No. 25 at 6. The Government claims TFO Collett's "recognition of the defendant was free from police-arranged suggestion, and the totality of the circumstances confirms its reliability." ECF No. 39 at 1.

At the outset, neither party has identified a Tenth Circuit case directly addressing the issue in this case—officer identification using photos and video from a separate officer's BWC footage from a separate investigation. However, the parties both evaluate TFO Collett's identification procedure under *Manson v. Brathwaite*, and the Court will do

21

the same. *Manson v. Brathwaite* sets forth that an "admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability." 432 U.S. at 106. First, the defendant has the burden of proving the identification procedure was "unduly suggestive." *English*, 241 F.3d at 1282. Then, the burden shifts to the government to establish the suggestive procedure was nonetheless reliable. *Id.* at 1282-83.

### 1. Whether the Identification Procedure was "Unduly Suggestive"

Mr. Mayorga-Ibarra bears the burden of establishing that TFO Collett's identification procedure was "unduly suggestive" such that "the suggestiveness must create a very substantial likelihood of irreparable misidentification." *Ruiz*, 116 F.4th at 1251. He points to several cases where courts found show-up identification unduly suggestive. ECF No. 25 at 8. However, he also admits the identification procedure in this case is unlike those in these show-up identification cases. *Id.* at 9. In a typical show-up identification case, courts analyze the "number of photographs in the array, the way that the police present the array, and the details of the photographs" presented to the identifying witness—often a civilian. *United States v. Kamahele*, 748 F.3d 984, 1019 (10th Cir. 2014). In this case, the identifying witness (TFO Collett) was a trained officer who relied on photos of a single individual from another officer's BWC footage. Therefore, the typical factors courts analyze in photo array identification procedures are not helpful here.

First, the Court must address the photos in this case. Defendant challenges TFO Collett's use of BWC footage in his identification procedure. As discussed above, the Court has determined that evidence from after 17:39:10 on January 17, 2023 will not be used at trial. The BWC photos sent from Officer Schoolmaster to TFO Collett were time-

stamped 6:00 p.m. or later. Under the exclusionary rule, these photos should be precluded from evidence as fruit of a poisonous tree. However, the Tenth Circuit has explained that "in the absence of evidence that the illegal arrest was purposefully exploited for investigatory objectives, fingerprints taken as part of a routine, booking procedure are not fruit of a poisonous tree." *United States v. Olivares-Rangel*, 45 F.3d 1116 (10th Cir. 2006). In *Olivares-Rangel*, the Court explained that "the exclusionary rule is calculated to prevent, not repair." *Id.* at 1104. "Certain routine administrative procedures, such as fingerprinting, photographing . . . are incidental events accompanying an arrest." *Id.* at 1113. "In light of the underlying purpose of the exclusionary rule, it would make little sense to suppress fingerprint evidence obtained merely as part of a routine booking procedure, even where a judge subsequently rules that the arrest was illegal." *Id.*

In this case, while the content at issue are not booking photos, the guiding principles in *Olivares-Rangel* are instructive. Here, the Officers' testimony does not suggest that the January 17, 2023 encounter was connected to, much less purposefully exploited for, TFO Collett's undercover drug trafficking investigation. Additionally, it is required procedure for officers to turn on their BWC during interactions with civilians. *See* Colo. Rev. Stat. § 24-31-901(1)(a)(II)(A) ("a peace officer shall wear and activate a body-worn camera or dash camera . . . during any interaction with the public initiated by the peace officer, whether consensual or nonconsensual, for the purpose of enforcing the law or investigating possible violations of the law."). Based on the Tenth Circuit's reasoning in *Olivares-Rangel*, even if the photos were obtained during or after an illegal arrest, they

are not fruits of a poisonous tree that should be suppressed. [7] Under this reasoning, TFO Collett's use of the photos from Officer Schoolmaster's BWC footage to identify Mr. Mayorga-Ibarra was permissible.

Next, the Court evaluates the suggestiveness of the identification procedure itself. The Tenth Circuit has described "unduly suggestive procedures" as those that "convey intentionally or unintentionally that police officers expect the witness to identify the accused or are so arranged as to make the resulting identifications virtually inevitable." *Johnson v. City of Cheyenne*, 99 F.4th 1206, 1220 (10th Cir. 2024). One-photo arrays are not unduly suggestive per se but may be "viewed in general with suspicion." *Id.* (citing *Manson*, 432 U.S. at 116). Defendant contends that the manner in which he was exhibited to TFO Collette in the BWC footage, "in police custody and [] eventually handcuffed," was unduly suggestive. ECF No. 25 at 10. However, he relies on two cases where the Tenth Circuit did not evaluate the district court's conclusion that the identification procedure was unduly suggestive. *See United States v. O'Neil*, 62 F.4th 1281, 1287 (10th Cir. 2023) (only considering defendant's "argument that the district court erred in concluding the witnesses made highly reliable identifications"); *United States v. Gallegos*, 111 F.4th 1068, 1082 (10th Cir. 2024) (explaining the government conceded the show-up identification was unnecessarily suggestive and limiting the analysis to "whether under the totality of the circumstances the identification was reliable"). Therefore, the Court does find these decisions persuasive at this step of the analysis.

An analysis of photo array case law demonstrates that the common thread in finding identification procedures not unduly suggestive is if it was presented in a "neutral

---

[7] Because the Government has agreed not to use statements after 17:39:10 on January 17, 2023, the Court does not make a specific finding as to whether or not the video footage is similarly permissible.

manner." *See United States v. Kamahele*, 748 F.3d 984, 1020 (10th Cir. 2014) (finding the array presentation not unduly suggestive because "the police detective had presented the photo array in a neutral manner, admonishing the witnesses not to identify anyone if they were unsure, telling them not to guess, and saying that they had no obligation to identify anyone"); *see also Galloway v. Cnty. of Nassau*, 141 F.4th 417, 424 (2d Cir. 2025) (finding "tainted identification" when the officer told the witness the suspect was already in custody and when the officer told a second witness that the first witness "already identified the shooter correctly").

In this case, TFO Collett's identification procedure was perhaps not ideal. Instead of requesting blindly administered photos, TFO Collett and Officer Schoolmaster exchanged text messages that contained photos of Mr. Mayorga-Ibarra. It is clear from these communications that TFO Collett did not follow best practices or prioritize eliminating potential biases in his identification process. However, based on the testimony and evidence, it is also evident that Officer Schoolmaster presented his evidence to TFO Collett in a neutral manner. TFO Collett asked about the circumstances surrounding Officer Schoolmaster's contact with the gray Subaru, and Officer Schoolmaster sent photos of the individual from the contact along with his identification information. Nothing from Officer Schoolmaster's messages persuaded or forced TFO Collett to make an identification. Instead, Officer Schoolmaster merely responded to TFO Collett's questions, without knowing the details of the underlying investigation. Considered together, the officers' testimony and evidence support the finding that TFO Collett's identification procedure was not unduly suggestive. The Court's inquiry into his identification procedure could end here.

## 2.  Whether the Identification Procedure was "Reliable"

Even if TFO Collett's identification procedure was "unduly suggestive," it was "sufficiently reliable under the *Bigger* factors to dispel any risk of misidentification." *Ruiz*, 116 F.4th at 1252 (stating the circuit court "need not decide whether the photo array procedure was unduly suggestive" because it agreed with the district court's determination that the procedure was sufficiently reliable). As indicated above, neither party has identified a precedential Tenth Circuit case. However, the Tenth Circuit did address a similar issue in *Caldwell*. There, the defendant argued an officer's in- and out-of-court identification procedures were unduly suggestive and unreliable and, therefore, the resulting identifications should have been excluded at trial. *Caldwell*, 1996 WL 185749, at *3. Judge Briscoe writing for the panel assumed, without deciding, that the pretrial identification procedures used by the officer was "unnecessarily suggestive" but concluded that the identification of the defendant was still reliable. *Id.* at *4.

Applying the *Biggers* factors, the Circuit Court found the officer was an experienced police officer who, during the course of the drug deal, "had close face-to-face contact and conversation with the person." *Id.* Judge Briscoe also noted that "although not specifically stated in the record, it [was] apparent that [the officer] was a trained police officer who realized that later he would have to find and arrest the person with whom he was dealing." *Id.* (citing *Brathwaite*, 432 U.S. at 108). The Circuit Court also determined that the officer's description "was somewhat generic, but nevertheless accurate" and the officer was "confident and certain about his identification." Thus, the Tenth Circuit concluded there was "nothing clearly erroneous about this factual

26

determination." *Id.* The Court further noted that "there is no dispute that the photographs in question were of defendant." *Id.* (citing *Brathwaite*, 432 U.S. at 115).

This case is similar. TFO Collett is a trained officer and had two separate interactions with the same driver in his drug transactions before making his initial identification. Although the interactions were short, Tenth Circuit case law "reinforces the proposition that, in certain cases, seconds-long observations of suspects can lead to reliable identification testimony." *United States v. Gallegos*, 111 F.4th 1068, 1084 (10th Cir. 2024). Both drug transactions occurred in daylight, and TFO Collett was about a foot and a half away from the driver with an unobstructed view. Like the officer's description in *Caldwell*, TFO Collett's written description of Defendant in his investigation report was "somewhat generic." The time between TFO Collett's second interaction with the drug runner on January 25, 2023 and his identification of Mr. Mayorga-Ibarra on February 7, 2023 was around two weeks. The Tenth Circuit has found that even two months between the crime and identification did not weigh against reliability. *United States v. Shoels*, 685 F.2d 379, 385 (10th Cir. 1982). Additionally, TFO Collett testified he was confident in his identification of Mr. Mayorga-Ibarra after seeing the text photos sent by Officer Schoolmaster. Further, there is no dispute Defendant is the individual from the BWC photos. Under the totality of the circumstances, these facts demonstrate that TFO Collett's procedure, while not perfect, was sufficiently reliable.

Even without watching video footage of Officer Schoolmaster's BWC, TFO Collett was confident Mr. Mayorga-Ibarra was the driver with whom he conducted drug transactions. On February 9, 2023, he then transacted for a third time with the drug runner

27

and knew he was Mr. Mayorga-Ibarra. Given all this, the Court finds that TFO Collett's out-of-court identification of Defendant should not be suppressed.

Because TFO Collett's pre-trial identification was reliable in the totality of the circumstances and outweighed any corruptive influence created by pretrial identification procedures, the Court concludes TFO Collett's out-of-court identification of Mr. Mayorga-Ibarra did not infringe upon Mr. Mayorga-Ibarra's constitutional rights. Further, any in-court identification based on the evidence and testimony provided by TFO Collett is admissible. *See Ruiz*, 116 F.4th at 1253 (holding that no substantial likelihood of misidentification was present and the identification was properly admitted before the jury).

Accordingly, Defendant's Motion to Suppress Out-of-Court and In-Court Identifications (ECF No. 25) is DENIED.

### IV.    CONCLUSION

For the foregoing reasons, the Court ORDERS:

1. Defendant's Motion to Suppress All Fruits of Mr. Mayorga-Ibarra's Unlawful Detention (ECF No. 26) is **GRANTED IN PART** with respect to evidence obtained after 5:39 p.m. on January 17, 2023 and **DENIED IN PART** with respect to evidence obtained before 5:39 p.m. on January 17, 2023; and

2. Defendant's Motion to Suppress Out-of-Court and In-Court Identifications (ECF No. 25) is **DENIED**.

DATED: April 9, 2026.

BY THE COURT:

_____

REGINA M. RODRIGUEZ
United States District Judge